RENDERED: JULY 10, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-1279-MR

ALYSSA REYES-DUDLEY                                           APPELLANT

v.            APPEAL FROM TAYLOR CIRCUIT COURT
           HONORABLE SAMUEL TODD SPALDING, JUDGE
                  ACTION NO. 25-CI-00213

MARIE DUDLEY AND DANIEL
BURTON                                                      APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  CETRULO, ECKERLE, AND MOYNAHAN, JUDGES.

CETRULO, JUDGE:  This appeal arises from an order granting *de facto* custodian status over a minor child to a grandmother over the objections of the child's mother.  Having determined upon our review of the record that the circuit court did not err in so ruling, we affirm.

# BACKGROUND

Alyssa Reyes-Dudley ("Alyssa") is the 29 year old mother of C.D. ("Child"), who was born in 2016 when she was 19 and unmarried.[1] Marie Dudley ("Marie") is Alyssa's mother, and she has been significantly involved in Alyssa's life from the time of Child's birth. Marie purchased a house 42 yards from her own home and rented it at a very favorable rate to Alyssa and Child. Marie also provided a room and bathroom for Child in her own home. Marie testified that Child has slept at her home four or five nights a week since he was two months old. She stated that this increased to five or six nights a week in 2020, until December 2024. Although Marie has full-time employment, she was the person who took Child to school, sports practices, and games; bathed and fed him; and took him to church on Sundays. The testimony was that Marie had taken Child on several vacations over the years, and some of these were with Alyssa, but not all.

Alyssa agreed that Child stayed with Marie a majority of the time and would take baths and brush his teeth at Marie's house. Marie was the contact person at Child's school; paid for his private school tuition, uniforms, and supplies; and attended all teacher conferences and extracurricular activities.

---

[1] Daniel Burton was named in this action as the father of Child, but the record indicates that he has not contributed at all to Child nor had any involvement as a parent. He was served by warning order attorney in this action, but did not participate.

In 2020, Alyssa obtained a job that was an hour and a half away from where the parties resided. Alyssa traveled to work for the week and would return to Child on weekends with Marie providing childcare. In early 2022, Alyssa testified that she contracted COVID-19 and developed long-term symptoms. She stated that this kept her from working at all, and again required Marie to do more of the transporting and caregiving, although Alyssa was taking online courses through 2025. Alyssa agreed that Child would spend the majority of nights at Marie's house from early 2022 through at least the end of 2023. While she was unable to work, she permitted Marie to claim Child on her taxes. Alyssa relied solely upon school loans and Supplemental Nutrition Assistance Program ("SNAP") benefits of $120 per month for her income during 2024 and 2025. She claimed that in the last two years, she had sometimes bought groceries and taken them to Marie's house to help. She also claimed that she sometimes paid for Child's sports fees, but she offered no evidence of any financial expenditures.

Marie produced financial records establishing that she had average expenditures for Child of $1,900 per month for three years. This did not include several vacations, special expenditures, or gifts for Child, nor did it include costs for food for the family. Marie testified that she paid for all of Child's clothing and meals. She claimed Child on her tax returns the past two years, with Alyssa's consent, as she was providing the only income and paying for his schooling.

Child's teacher for the last two school years testified that Marie was the contact person for all school communications, that she brought him to school and picked him up, and that Alyssa was not in the picture during that two year time frame. However, Alyssa testified that she did pick up Child from afterschool care, and she continued to take him to medical appointments. She did maintain Medicaid insurance on Child and obtained SNAP benefits based upon Child residing with her. She presented forms that Marie had signed on two occasions, verifying that Child lived with Alyssa. She also testified that she had been ill since 2022, and that until 2025, she was unable to work as she went through testing to determine a diagnosis. She testified that she is now on medication and able to fully parent.

In 2023, Alyssa married Nexman Reyes, a Honduran immigrant. They had a child together in 2024 and continued living together in Marie's house. In December 2024, Nexman and Alyssa began limiting Child to spending nights at Marie's house only on weekends. He continued to go to Marie's for breakfast, where she would pack his lunch and then take him to school. He would brush his teeth, take baths, and do his homework at Marie's home. Even though Child had gone to private school, paid for by Marie his entire life, Alyssa enrolled Child in public school for the fall of 2025. The testimony revealed that Nexman was a hard

worker and a good father figure for Child and that he and Alyssa were beginning to exercise more parenting roles in the months prior to this action.

However, Nexman was not present at the hearing that ultimately transpired. In June 2025, Alyssa and Nexman attended an immigration-related interview. Government officials detained Nexman and deported him to Honduras. Alyssa began talking about moving to Honduras with the two children. She told Marie that the children's passports were in the mail and she started a "Go Fund Me" page to assist her in this move. Marie became concerned about the plan to take Child to a country where he does not speak the language; which is known for having very high crime rates; and which has a level three travel advisory.

Marie filed an emergency motion for custody alleging she had been the primary financial provider for Child, that he stayed with her approximately 95% of the time, and seeking *de facto* custody. At the time this was filed, Alyssa was in Chicago visiting Nexman's relatives with the two boys. An *ex parte* order was signed granting Marie temporary custody. Three days later, the court set aside the *ex parte* order but required that Child remain in Kentucky pending a *de facto* hearing.

At the hearing on August 29, 2025, the parties and four witnesses testified. Additional testimony proffered in support of Marie's position was not produced due to the time constraints and verbal statements from the circuit court.

The court set forth its findings and conclusions in an order dated September 10, 2025. Therein, it noted there are three ways to qualify as a *de facto* custodian under Kentucky precedent. Two of those three ways are: 1) if the biological parent is unfit; or 2) if the biological parent has waived their superior right to custody. *Mullins v. Picklesimer*, 317 S.W.3d 569, 575 (Ky. 2010). The third way, which the court found to be the qualification in this case, is to meet the legal requirements of KRS 403.270(1). That provision requires a finding that the non-parent has been the primary caregiver and financial supporter of a child for the period mandated by that section.

Having heard the testimony, the circuit court concluded that Marie did prove by clear and convincing evidence that she was the primary caregiver and financial supporter of Child for several years. The court further went on to consider the best interests of Child, awarding joint custody to Marie and Alyssa, with Alyssa being designated as the residential custodian.

The circuit court personally conducted extensive questioning of Alyssa about the deportation of Nexman. In response to those inquiries, Alyssa confirmed that the "best case scenario" would likely mean that he would not be permitted to return to the United States for two years. The "worst case scenario" would be that he would not be permitted to return at all. Alyssa testified that she sought to move to Honduras where they would live with his mother and sisters

with the anticipation that they could someday return to the United States. However, she also testified that she would only be permitted to stay there for 90 days at a time and would need to return to the United States periodically, until she could acquire marriage residency in Honduras. Once she could acquire residency in Honduras, she planned to remain there until her husband could also return with her to the United States.

After finding Marie to be a *de facto* custodian, the circuit court addressed the pressing issue before it at that time, Alyssa's travel plans. Naming her the primary residential custodian, the court stated:

> This will authorize Alyssa to take [Child] with her to Honduras. In making this very difficult decision, the Court believes Alyssa is a good mother who genuinely loves her children. She deserves to reunite [Child] with his stepfather, with whom he has a great relationship, and younger sibling. The Court is hopeful Alyssa and Nexman will return to the United States when legally allowed. The Court will further award Marie timeshare at various intervals throughout the year based on her financial ability to fly [Child] to the United States, and provide a private tutor when [Child] is in her care.

Marie filed a motion to alter, amend, or vacate under CR[2] 59.05. The circuit court denied that motion on September 30, 2025. Both parties filed an appeal from the September 10, 2025 ruling. Asserting that she was "parenting alongside her mother," Alyssa argued that the court disregarded precedent in

---

[2] Kentucky Rule of Civil Procedure.

granting Marie *de facto* status. Marie cross-appealed from the circuit court's finding permitting Alyssa to take Child to Honduras, arguing it was not in his best interest. That cross-appeal, however, was later voluntarily dismissed. The record indicates that this dismissal occurred because Alyssa and Child returned from Honduras to Kentucky. The appeal by Alyssa alleges that the circuit court erred in finding clear and convincing evidence that Marie qualified as a *de facto* custodian.[3]

## STANDARD OF REVIEW

On appeal, we first review a circuit court's factual findings, disturbing them only if they are clearly erroneous – meaning they are unsupported by substantial evidence which is defined as that which is sufficient to induce conviction in the mind of a reasonable person. *Ball v. Tatum*, 373 S.W.3d 458, 463–64 (Ky. App. 2012). Under CR 52.01, we defer to the circuit court's factual findings unless clearly erroneous, giving due regard to the court's superior opportunity to evaluate witness credibility and weigh conflicting testimony.

---

[3] Alyssa also argues that the circuit court erred in considering the best interest of Child and custody at this same *de facto* hearing. Counsel for Alyssa did object to this combination early in the proceeding, but nonetheless, both parties elicited testimony pertaining to the current custody issues and Alyssa's desire to take the child to Honduras. All litigants appeared to acquiesce to the court having just one hearing considering the urgency of the issue. *Burgess v. Chase*, 629 S.W.3d 826, 829 (Ky. App. 2021). The record reveals that Alyssa had already taken both children to Honduras by the time counsel appeared on post-judgment motions, just a few weeks later in September 2025. Accordingly, we do not find that combined process to have been in error under the facts of this case.

*Moore v. Asente*, 110 S.W.3d 336, 354 (Ky. 2003). Second, we examine the circuit court's application of the law *de novo*. *Ball*, 373 S.W.3d at 464.

## ANALYSIS

The standard to achieve *de facto* custodian status is very high, because "[t]he courts of this Commonwealth have consistently recognized the superior right of natural parents to the care, custody, and control of their children as well as the constitutionally protected right of a parent to raise his or her own child." *Brumfield v. Stinson*, 368 S.W.3d 116, 118 (Ky. App. 2012). As properly noted, before the circuit court may find that a caregiver has become the *de facto* custodian, it must determine that the non-parent has taken over the role of primary caregiver and financial supporter of the child for the required period of time. *Id.* (citations omitted). "[O]ne must literally stand in the place of the natural parent to qualify as a *de facto* custodian." *Id.* (internal quotation marks and citation omitted).

In *Brumfield*, this Court reiterated the holdings of several *de facto* cases that even if a non-parent provides care and/or financial support for a child, *if it is in conjunction with the natural parent*, the non-parent will not qualify as a *de facto* custodian. *Id.* (citing *Boone v. Ballinger*, 228 S.W.3d 1 (Ky. App. 2007); and *Mullins v. Picklesimer*, 317 S.W.3d at 573-574). Despite what might appear to be clear guidance on the subject, the disputes and the appeals have continued. As in

this case, these situations often involve parent(s) versus grandparent(s) of a minor child and generally involve grandparents who are providing significant financial and parenting aid. It is indeed unfortunate that such situations continue to result in protracted litigation when the children are fortunate enough to have multiple concerned relatives.

However, it is also true that appellate courts defer to the factual findings of the lower court, and these cases are all factually intensive. This deference has resulted on occasion in seemingly inconsistent case law. As noted, for the past 20 years, our precedent has stated that co-parenting is not sufficient to establish *de facto* status. However, a review of the case law reveals that we have nonetheless found in favor of *de facto* status for the non-parent on several occasions where the parent claims to be co-parenting.

In *Ball v. Tatum*, the non-parents presented evidence that they had provided 95% of the child's financial support, addressed 95% of the child's medical issues, and that the biological parent had not provided financial care. 373 S.W.3d at 464. In upholding the *de facto* status, we stated that the care provided by the non-parent need not be exclusive where a parent has essentially abandoned parental responsibility. *Id.* at 464.

In *Allen v. Devine*, 178 S.W.3d 517 (Ky. App. 2005), this Court upheld *de facto* status even though the parents regularly visited and provided

Women, Infants, and Children payments, finding that the grandparents had primarily kept the children for at least a couple of years and provided essentially all the food and clothing. In *Sizemore v. Hutton*, we found sufficient evidence to support the trial court's finding that a grandparent was a *de facto* custodian where the child lived primarily at grandparent's home, teachers communicated with them, and witnesses supported that child had lived with them for a period of six years. No. 2022-CA-1397-MR, 2023 WL 8286947 (Ky. App. Dec. 1, 2023). *See also Sutton v Higdon*, No. 2024-CA-0964-MR, 2025 WL 3683225 (Ky. App. Dec. 19, 2025) (wherein we upheld a finding of *de facto* status in favor of grandfather, where mother did not dispute that she provided no financial support, food, or clothing for the child for approximately 18 months).[4]

In contrast, we have denied *de facto* status in seemingly similar situations where we have found a co-parenting situation exists. For example, in *Chadwick v. Flora*, 488 S.W.3d 640 (Ky. App. 2016), the trial court denied a grandmother's petition for *de facto* custodianship because the parent was not "the" primary caregiver but rather was co-parenting with grandmother. *Id.* at 645. We affirmed on appeal because the trial court's factual findings were supported by substantial evidence, and we would not substitute our judgment for the trial courts.

---

[4] We cite these unpublished cases not as binding authority, but for illustrative purposes pursuant to Kentucky Rules of Appellate Procedure (RAP) 41(A).

In *Burgess v. Chase*, 629 S.W.3d 826 (Ky. App. 2021), our Court reversed an award of *de facto* status and joint custody to a grandmother. The court therein had held that the grandmother had been child's primary caregiver and financial provider and acting parent for nearly all the child's life. In reversing, we held that the mother had nonetheless made some decisions for the child and exercised her parenting time afforded her by a joint custody decree previously entered. *Id.* at 833. Our Court found that despite the grandmother's "generous provision of care and financial support" she was "parenting alongside the natural parent" and this was not sufficient under our case law. *Id.* at 832–33. Alyssa obviously relies heavily upon *Burgess* in her appeal. *See also Smallwood v. Smallwood*, No. 2024-CA-0299-MR, 2025 WL 2006048 (Ky. App. Jul. 18, 2025) (wherein the mother and child lived in the same house as the grandparents who were seeking *de facto* status); *Kingcade v. Sherwood*, No. 2019-CA-1711-MR, 2020 WL 6818440 (Ky. App. Nov. 20, 2020) (holding the trial court's decision denying grandparents *de facto* status was consistent with our precedent as they were sharing parenting duties with parents rather than acting in their stead).[5]

Here, we do not take exception to the circuit court's findings which were thorough and each supported by the evidence, nor can we conclude that the

---

[5] Again, we cite these unpublished cases not as binding authority but for illustrative purposes pursuant to RAP 41(A).

court disregarded the law or precedent. Rather, the circuit court's findings, conclusions, and judgment discussed and analyzed several of the cases referenced above. Admittedly, the law appears conflicting at times in its application to specific facts, but the circuit court properly recognized the superior right of parents to raise their own children. *Lambert v. Lambert*, 475 S.W.3d 646, 651 (Ky. App. 2015). The court further properly addressed the legal requirements of KRS[6] 403.270. As stated on several occasions, this was a very difficult case and one with which the circuit court struggled due to the highly unusual circumstances.

As this Court has stated repeatedly, at all times, we must remember that the test is not whether we would have decided it differently, but whether the findings of the circuit court are clearly erroneous; whether it applied the correct law; or whether it abused its discretion. *S.E.A. v. R.J.G.*, 470 S.W.3d 739, 742 (Ky. App. 2015) (citations omitted). Having heard the testimony, this particular court concluded that Marie had established by clear and convincing evidence that she was *the* primary caregiver for and financial supporter of Child for a period exceeding one year. *See Boone v. Ballinger*, 228 S.W.3d 1 (Ky. App. 2007); KRS 403.270(1)(a). The court found that Alyssa had abdicated that role for various reasons, some of which may not have been her fault. However, those circumstances (working out of town, having an illness, limited finances) led her to

---

[6] Kentucky Revised Statute.

-13-

turn over parenting duties to her mother for most of Child's life. Marie had primarily handled school duties; transportation; daily living and hygiene duties; food and shelter; and provided for all the extras including birthday and holiday gifts, extracurricular fees, and multiple vacations for Child.

While Alyssa had become more involved in the eight months prior to the hearing, this appeared connected to her recent marriage and additional support from Nexman, which was now again absent. Alyssa simply did not produce any evidence that she provided primary care or financial assistance, and she did not dispute the evidence produced by Marie who bore the burden of proof. While we have consistently held that it is a difficult burden and we do not depart from that precedent with this decision, the evidence as a whole showed Alyssa's parenting role for at least two to three years had been minimal at best. She clearly knew Marie would provide for and take care of Child, and she was willing to relinquish that responsibility, until she was not.

A very recent published case from this Court is particularly similar to the facts presented here. In *York v. Hamlet*, No. 2024-CA-1406-MR, 2026 WL 1616086 (Ky. App. Jun. 5, 2026), we were called to review a judgment that denied *de facto* status to grandparents in favor of their son, the child's father. The family court concluded that even though the child therein had resided with grandparents for substantial periods of time, the evidence as a whole did not satisfy the statutory

-14-

requirements for *de facto* custodian status. *Id*. at \*6. Our Court on appeal upheld the trial court stating:

> Ultimately, this case did not present a circumstance in which the evidence compelled only one factual conclusion. Rather, the family court was presented with conflicting testimony concerning whether Grandparents had become Child's primary caregivers and financial supporters within the meaning of KRS 403.270, or whether the parties instead functioned in an ongoing cooperative caregiving arrangement in which Father continued exercising his parental role despite Child's substantial periods of residence with Grandparents.

*Id.* at \*5.

The Court went on to reiterate, as we have so often said, that the judge, as factfinder was entitled to weigh the competing testimony, assess witness credibility, and resolve those factual disputes. *Id.* at \*6. "While the record unquestionably contains evidence favorable to Grandparents, the existence of conflicting proof does not permit this Court to substitute its judgment for that of the family court." *Id.*

## CONCLUSION

Even though this case results in a contrary result, in favor of a grandparent, the premise is the same. This record unquestionably contains evidence favorable to Alyssa, but the existence of conflicting proof does not permit this Court to substitute its judgment for that of the circuit court. Because substantial evidence supported the determination that Marie met her burden of

-15-

proof under KRS 403.270, by clear and convincing evidence, we find no reversible error.  Accordingly, we AFFIRM the Taylor Circuit Court.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Katina B. Miner
Bowling Green, Kentucky

BRIEF FOR APPELLEE
MARIE DUDLEY:

Wesley E. Bright
Campbellsville, Kentucky